# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARILYN BREGMAN, as a representative of the ESTATE OF MORTON BREGMAN, MARILYN BREGMAN, as heir and beneficiary of the Estate,<br><br>           Plaintiff,<br><br>      v.<br><br>UNITED STATES OF AMERICA,<br><br>           Defendants. | Case No. CV 12-10930 BRO(FFMx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL** |

## I. INTRODUCTION

Plaintiff Marilyn Bregman was married to the decedent, Morton Bregman, who was 87 years old at the time of his death. Morton Bregman served the United States of America as a soldier during World War II. He sustained a serious injury and eventually, in April 2008, doctors amputated his left leg amputated below the knee. Given his military service, he received medical care from the Veteran's Affairs ("VA") Administration. For three years, Mr. Bregman resided at the VA nursing home. In December 24, 2010, Mr. Bregman was admitted to the VA Hospital Emergency Room. The care received by Mr. Bregman provides the centerpiece of this dispute. Mrs. Bregman, and Mr. Bregman's Estate, maintain that VA hospital personnel failed to provide adequate care to Mr. Bregman which resulted in his death. The government responds, saying that the care provided was adequate and Mr. Bregman died of natural causes.

## II. PROCEDURAL HISTORY

On December 26, 2012, Mrs. Bregman filed a complaint for damages. (Dkt. No. 1.) The United States answered the complaint on March 30, 2013. (Dkt. No. 6.) On May 14, 2014, the Court dismissed Mrs. Bregman's third cause of action. (Dkt. No. 48.) On July 22, 2014, a bench trial in this matter commenced. (Dkt. No. 74.) The bench trial concluded on July 25, 2014. (Dkt. No. 76.) After consideration of the parties' post-trial briefs, the evidence presented at trial, and oral argument of counsel, the Court makes the following Findings of Fact and Conclusions of Law.[1]

## III. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this case pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Plaintiffs also invoke this Court's jurisdiction under 28 U.S.C. §§ 1331, 1346(b). Further, venue is proper under 28

---

[1] Any finding of fact which constitutes a conclusion of law is hereby adopted as a conclusion of law.

U.S.C. § 1402, as a substantial part of the events giving rise to these claims arose within the Central District of California.

## IV. <u>CREDIBILITY DETERMINATIONS</u>

Ninth Circuit Model Jury Instruction 1.11 provides guidance to jurors when assessing credibility. The factors include: (1) the opportunity and ability of the witness to see or hear or know the things testified to; (2) the witness's memory; (3) the witness's manner while testifying; (4) the witness's interest in the outcome of the case and any bias or prejudice; (5) whether other evidence contradicted the witness's testimony; (6) the reasonableness of the witness's testimony in light of all the evidence; and, (7) any other factors that bear on believability. Ninth Cir. Model Jury Instr. (Civil) 1.11 (2007). The Court finds these factors helpful in assessing the credibility of the witnesses. After assessing these factors, the Court finds the testimony detailed below to be credible.

## V. <u>FINDINGS OF FACT</u>

Exhibits 1, 2, 3, 4, 5, 6, 9, 10, 11, 101, 102, 103, 105, 107, and 108 were received into evidence, and the Court considered them in reaching its decision.

Mr. Bregman became largely bedridden in 2007, after suffering a broken leg related to a bone infection. Approximately six months later, in April 2008, doctors amputated Mr. Bregman's leg above the knee.[2] Mr. Bregman's albumin levels declined from 2008 to 2011, giving him a 20 percent mortality by virtue of his serum albumin levels alone. Declining albumin levels reflects long-term nutritional status. In August 2010, Mr. Bregman was admitted to the VA Hospital for an irregular heart rate, or atrial fibrillation, as well as pneumonia and sepsis. Doctors admitted Mr. Bregman and kept him in the Intensive Care Unit ("ICU"). After five days, doctors

---

[2] Among the elderly, the five-year survival rate is five to ten percent for amputees.

3

moved Mr. Bregman to the general medical floor ("GMED").  Dr. Gregory Brent[3] was his attending physician.  On August 17, 2010, Mr. Bregman recovered and returned to the nursing home.

In October 2010, Mr. Bregman was again transported to the ER of the VA Hospital.  Within two days, Mr. Bregman again improved and doctors transferred him to the GMED.  On November 3, 2010, doctors discharged Mr. Bregman and he returned to the nursing facility.  Although doctors determined it was appropriate to transfer Mr. Bregman to the nursing facility, he remained "way below his previous baseline, weak, confused, somnolent and . . . incomprehensible 90 per cent of the time."

Mr. Bregman returned to the ER on December 24, 2010.  Doctors admitted Mr. Bregman into the ICU on December 24, 2010 for hypoxia (low levels of circulating oxygen), altered mental status (for example, somnolent) and hypothermia (low body temperature).  In addition, Mr. Bregman was suffering from sepsis (an infection),[4] and methicillin-resistant staphylococcus aureus (MRSA)(a bacterial infection), probably caused from pneumonia.  Mr. Bregman also suffered from sleep apnea.  Mr. Bregman was given vasosuppressors, among other medications, a drug given to critically ill patients.

Dr. Saft served as Mr. Bregman's attending physician when Mr. Bregman was admitted to the ICU on December 24, 2010.  As a result, Dr. Saft was ultimately responsible for Mr. Bregman's care in the ICU.  Patients typically sleep poorly in the ICU, so there is an attempt to transfer them to another unit as soon as is safely possible to enable the patient to sleep more deeply.  Because Dr. Saft believed that

---

[3] Dr. Brent serves as the Chair of the Department of Medicine at the Greater Los Angeles VA.  He is a professor of medicine and psychology at UCLA School of Medicine.  Prior to that, Dr. Brent worked at Harvard Medical School.

[4] The mortality rate of persons over 80 suffering from sepsis is 80 percent.  The mortality rate for healthy patients over 65 is 50 percent.

Mr. Bregman was improving clinically, he agreed to transfer Mr. Bregman out of the ICU.

On the morning of December 31, 2010, doctors transferred Mr. Bregman to the GMED. Mr. Bregman was physically transferred from ICU to the GMED ward at 9:00 a.m. on December 31, 2010. Doctors from the ICU ward continued to care and write orders for Mr. Bregman until his care was transferred to GMED doctors at 4:00 p.m. on December 31, 2010. Dr. Gregory Brent became the attending physician assigned to care for Mr. Bregman upon his transfer to GMED from ICU. He oversaw a team of doctors, including a resident, Dr. Tyralee Goo, and an intern, Dr. Rachel Winter. Dr. Brent knew Mr. Bregman because he had previously cared for Mr. Bregman during his August 2010 hospitalization. Dr. Brent concurs with the decision to transfer Mr. Bregman from the ICU ward to the GMED ward.

On December 31, 2010, Dr. Winter examined Mr. Bregman and spoke with him. Dr. Winter also spoke with Marilyn Bregman, who stated that Mr. Bregman had returned to his baseline. Dr. Winter met with Mr. Bregman in the afternoon on December 31, 2010. When Dr. Winter entered the room, Mr. Bregman was lying comfortably. Either Mrs. Bregman or Mr. Bregman's sister, Elsie Miller, informed Dr. Winter that Mr. Bregman was at his baseline. He required a BAIR Hugger on December 31, 2010, a device used to increase a patient's body temperature.

On December 31, 2010, respiratory therapist Gail Jensen worked from 7:00 p.m. to 7:30 a.m. On December 31, 2010 at 4:32 p.m., Mr. Bregman's medical records reflect that a respiratory therapist ordered a BiPAP.[5] It is her practice that, in response to that order, Ms. Jensen would give Mr. Bregman a BiPAP mask that fit him. Patients with nasogastric (NG) tubes can wear a BiPAP mask, using a full mask, one that is used for patients who have an NG tube. She has never had a

---

[5] APAP, BiPAP, and CPAP are slightly different masks providing positive airway pressure. The Court uses the terms interchangeably here.

situation where a BiPAP mask did not fit. It remains the choice of the patient, however, because a patient does not have to wear a BiPAP unless they want to do so.

Exhibit 1 reflects that, on December 31, 2010, Ms. Jensen visited Mr. Bregman. Exhibit 1 further details that she provided Mr. Bregman with a full face mask BiPAP mask. Based upon her practice, she would have given Mr. Bregman a BiPAP mask at night and charted that fact in the morning. A BiPAP machine is typically used by patients during the nighttime, when they are sleeping.[6] Ms. Jensen has never seen an order requiring the use of a BiPAP during the day. Although she does not remember Mr. Bregman, it was her practice to raise the head of Mr. Bregman's bed to speak with him. Ms. Jensen did not note this information in the chart. If Mr. Bregman were asleep when she entered, she would have noted it.

On December 31, 2010, Barbara Gosk, R.N., the night nurse, cared for Mr. Bregman. She took his vital signs. She recorded the vital signs in his medical record. At 12:44 a.m. on December 31, 2010, Nurse Gosk verified that she had read the order of the doctors regarding the aspiration precautions, namely elevating the head of the bed.

Shalonda Wilson, R.N., cared for Mr. Bregman on January 1, 2011 when she relieved Nurse Gosk. Nurse Gosk briefed Nurse Wilson on January 1, 2011. Nurse Wilson's duties included providing any intravenous medication to Mr. Bregman. When Nurse Wilson entered Mr. Bregman's room, he was sleeping and not easily arousable. Nurse Wilson was able to awaken Mr. Bregman by rubbing on his chest. Nurse Wilson completed her charting after her rounds, but signed out of her notes at the end of her shift. Nurse Wilson's note, Exhibit 1, p. 402, is the entry she made for Mr. Bregman on January 1, 2011. Nurse Wilson also spoke with Nurse Gosk at the end of her shift to brief Nurse Gosk. Nurse Wilson did not advise Nurse Gosk of anything abnormal during her (Wilson's) shift.

---

[6] Dr. Brent recalls Mr. Bregman using a BiPAP only at night.

Findingsfnl.docx
6
FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

At 6:00 a.m. on January 1, 2011, Dr. Winter "pre-rounded" or examined Mr. Bregman prior to formal rounds. At 6:34 a.m. and 7:20 a.m., nurses provided Mr. Bregman with medication. When preparing for rounds, Dr. Winter first speaks with the overnight doctor to determine whether there were any concerns that evening. She then checks the computer to see if there are any new notes. She next reviews the vital signs that have been entered overnight. Finally, Dr. Winter completes her pre-rounds by visiting with and examining each patient.

On January 1, 2011, between 7:00 a.m. and 7:30 a.m., Dr. Brent arrived at the VA Hospital. Dr. Brent and his team spent about four hours "rounding" or meeting with patients. The intern will present the findings and history from the patient the team is discussing. The team then talks about a plan for the patient, things to look for when assessing the patient. Dr. Brent also reviews the orders that were in effect that day and approves the orders when he agrees they were appropriate. Then, the team meets with the patient, examines the patient, and decides how to proceed with the patient's care. Dr. Brent spent two hours writing notes on the patient charts and he completing his "rounds." Dr. Brent followed this procedure on January 1, 2011.

On January 1, 2011, Dr. Brent met with Dr. Goo and Dr. Winter. Dr. Winter presented Mr. Bregman's history, the findings, how he was responding to treatment, his lab work, his x-ray, among other things. In total, Dr. Brent spent approximately 45 minutes to one hour on Mr. Bregman's care, including the presentation, his visit with Mr. Bregman and his note writing. Specifically, Dr. Brent spoke with doctors Goo and Winter about Mr. Bregman's mental status, his delirium (altered sensorium) and arousability. Dr. Brent also reviewed the vital sign worksheet that day for Mr. Bregman. Dr. Brent believed that Mr. Bregman had an increased susceptibility to such difficulties given his previous stroke and/or sepsis.

On January 1, 2011 at 8:00 a.m., Nurse Wilson examined Mr. Bregman. She went into his room and Mr. Bregman was sleeping. He was not in distress. She rubbed his chest in a circular motion to get him to open his eyes. She did not note

any abnormalities, but did note that Mr. Bregman was not easily arousable.  She believes that the head of Mr. Bregman's bed was raised when she entered.  Later, she spoke with Mrs. Bregman, who did not express any abnormalities.  If there had been an abnormality, she would have called the doctors and made a note of it.

On January 1, 2011 between 8:45 a.m. and 10:00 a.m., Dr. Brent, Dr. Winter and Dr. Goo "rounded," or examined their patients together.  Mr. Bregman was not wearing a BiPAP mask when Dr. Brent examined him on his rounds, because it would have been unusual to him.  When Dr. Brent visited Mr. Bregman, he was not using a BAIR Hugger.  Likewise, Dr. Brent would have noted in his records if Mr. Bregman's oxygen saturation levels were below 92, because that would have been remarkable.  Dr. Brent considered low oxygen levels as a cause of Mr. Bregman's altered mental status, but rejected it because Mr. Bregman's oxygen levels were not low.  That day, Mr. Bregman was sleepy but "arousable."  He responded appropriately to questions.  Although Mr. Bregman experienced a 20-point drop in blood pressure while sleeping the previous night, it did not require medical intervention because it remained on the low side of a normal range.

Dr. Winter took notes, dated January 1, 2011, of the rounds.  Exhibit 1, pages 401 through 407 detail her daily progress notes.  Her progress note does not include Mr. Bregman's O2 saturation level or vital signs after 1:00 a.m., although it is her practice to check the nurse's clipboard for the current vital signs.  She does not import the vital signs from the clipboard into her notes unless they are abnormal.  Dr. Goo would document anything out of the ordinary or provide detail to the intern's notes.  On January 1, 2011, Dr. Goo does not recall anything abnormal.  Exhibit 9 reflects the discharge summary written by Dr. Goo and approved by Dr. Brent.  The note reflected a conversation with Mrs. Bregman wherein she stated that it was not abnormal for Mr. Bregman to be in a deep sleep often.  The note also reflects that Mr. Bregman would awaken at times and become alert.

8

FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL

Findingsfnl.docx

June Smith, Licensed Vocational Nurse, attended to Mr. Bregman on January 1, 2011. She did not, however, speak to a doctor about him. Her shift began at 7:30 a.m. and ended at 8:00 p.m. She and Nurse Wilson did reposition Mr. Bregman during the course of her shift and give him prescribed medications. Nurse Smith repositioned Mr. Bregman four times that day.

Nurse Smith took Mr. Bregman's vital signs twice during her shift, once at 8:00 a.m. and once at 4:00 p.m. There was nothing abnormal about Mr. Bregman's vital signs that day. Vital signs are taken every 8 hours. Mr. Bregman's vital signs were not abnormal. As is the practice at the VA Hospital, vital signs do not go directly into the electronic record. Consistent with VA practice, Nurse Smith entered the vital signs on a sheet of paper attached to a clipboard at the nursing station. During the day, someone would enter the vital signs into the electronic patient record. January 1, 2011 was a busy day, so she did not have time to enter the vital signs into the computer. The VA hospital nurses typically charted at the end of the shift. She would have entered a note in the medical records if there had been any abnormality. Nurse Smith did make any notes in Mr. Bregman's medical charts.

Nurse Smith interacted with Mr. Bregman during the day; his speech was garbled, but they were able to carry on a conversation. Mrs. Bregman would "translate" Mr. Bregman's garbled speech. Mr. Bregman would open his eyes, and then drift back to sleep during her re-positioning of him. The head of his bed was raised. She did not have any concerns regarding Mr. Bregman's mental state that day. Mrs. Bregman did not express any concerns about him that day either.

Nurse Gosk again cared for Mr. Bregman on January 1, 2011. Her shift began at 7:30 p.m. on December 31, 2010 and ended on January 1, 2011 at 8:00 a.m. Exhibit 1, pages 397 through 399 reflect the entirety of her notes for Mr. Bregman during that shift. During her shift, Nurse Gosk repositioned Mr. Bregman every two hours. Nurse Gosk discovered Mr. Bregman had died when she entered his room at approximately 8:20 or 8:30 p.m. At that time, Mr. Bregman was warm to the touch,

but his skin tone had changed. Nurse Gosk checked Mr. Bregman's pulse and did not feel a pulse. She then called a supervisor who also checked for Mr. Bregman's pulse and found none. Mr. Bregman was not breathing so the two nurses stopped the feeding and performed CPR. During that time Nurse Gosk did not see any foamy white substance. Nurse Smith began to input the vital signs into the computer after her shift when Nurse Gosk came to the Nurse's station and said that Mr. Bregman was not breathing. At that point, hospital staff began responding and a crash cart was ordered.

Exhibit 1, page 409 is the tissue donor worksheet Nurse Gosk completed. The worksheet asks for the last temperature of the decedent. The template permits two options, either entering the temperature manually or importing it from the computer. Nurse Gosk entered the temperature manually from the handwritten paper vital signs sheet. After Mr. Bregman passed away, Nurse Gosk was responsible for filling out the tissue donor sheet. Nurse Gosk input Mr. Bregman's last temperature, 99.1, into the computer. The computer had generated an automatic time stamp, giving the appearance that Mr. Bregman's temperature was 99.1 at 1:00 a.m., after he had passed away.

Maureen Keckeisen, Registered Nurse, is an advanced practice nurse and a certified Clinical Nurse Specialist. As detailed in Exhibit 102, she has over 30 years of experience in critical care nursing. Currently, Nurse Keckeisen serves as the Clinical Nurse Specialist for the Transplant/Surgical Specialties ICU at UCLA Ronald Reagan Hospital and has done so since 1991. In preparation for providing opinions in this case, she reviewed the reports of Dr. Yick, Dr. Seleznick, Nurse West, and the depositions of Dr. Brent, Dr. Saft, Nurse Jensen, Nurse Smith, Nurse Wilson, Dr. Winter, Elsie Miller and Marilyn Bregman, the declarations of Dr. Saft, Nurse Wilson and Nurse Smith, as well as the medical record in this case in reaching

her opinions. She believes that the nurses' care for Mr. Bregman was within the standard of care.[7]

Dennis Yick, M.D., has been an attending physician at UCLA-Olive View Medical Center since 1998. As explained in Exhibit 101, he is Board Certified and specializes in Pulmonary and critical Care medicine. Dr. Yick also serves as the Medical Director of the ICU and "Step Down Unit." In connection with his testimony in this case, Dr. Yick reviewed the 972-page medical record in this case, the depositions of Dr. Brent, Dr. Seleznick, Dr. Winter, Dr. Saft, Nurse Wilson, Nurse Smith, Elsie Miller, and Gail Jensen, Dr. Yick does not believe that Mr. Bregman suffered from $CO_2$ narcosis because his arterial blood gases do not support such a conclusion. He is also the Chairman of the Hospital's CPR Committee. In that capacity, Dr. Yick reviews every death and the causes. Dr. Yick believes that the medical care provided to Mr. Bregman was up to the standard of care within the community.[8] Dr. Yick does not believe that Mr. Bregman faced a risk of death due to aspiration pneumonia on January 1, 2011.

Dr. Saft originally opined that Mr. Bregman died of an "aspiration event." However, he retracted that opinion, as it was never to a degree of medical certainty. Dr. Saft retracted his opinion after a more detailed review of the records. Specifically, Dr. Saft relied upon the medical notes for 6:00 p.m. on January 1, 2011, which stated that Mr. Bregman was breathing comfortably, had an endotracheal tube

---

[7] The Court rejects the testimony of Nurse Tricia West. Nurse West's opinions center upon the premise that if a fact is not contained within the medical record, it did not happen. The Court finds this opinion in direct contradiction to the testimony of Nurses Wilson, Gosk, Smith, Ms. Jensen, as well as the testimony of Dr. Brent, Dr. Goo, and Dr. Winter, which this Court found to be credible. As a result, Nurse West's opinions are unpersuasive.

[8] The Court rejects the testimony of Mitchel Seleznick, M.D. While the Court accepts Dr. Seleznick's qualifications, he specializes in rheumatology, not at issue here. Before he completed his expert report, Exhibit 6, Dr. Seleznick had not reviewed the depositions of Dr. Brent, Nurse Wilson, or Nurse Smith. Dr. Seleznick bases his opinions in many instances on the lack of documentation in the medical record, opining that the lack of documentation demonstrates that Mr. Bregman was not receiving appropriate medical care. The Court finds this opinion unpersuasive.

in place and that nurses did not see any food stuff. Now, Dr. Saft agrees that Mr. Bregman died as a result of cardiac arrest.

The cause of death on Mr. Bregman's Death Certificate, Exhibit 2, lists methicillin-resistant staph aureus pneumonia, with other significant conditions such as congestive heart failure, atrial fibrillation, bladder cancer and prostate cancer. The Death certificate lists the most immediate cause of death. Dr. Brent believes Mr. Bregman died from cardiac disease.

Marilyn Bregman, Mr. Bregman's wife for 62 years, is 87 years old. Mrs. Bregman visited her husband daily in the hospital. She spent approximately eight hours per day with him. She also visited him daily for three years when he was in the nursing home. She took Mr. Bregman out to dinner and pushed him in his wheelchair around the nursing home grounds. The two attended lectures together. On some weekends Mr. Bregman would return to their home. Her plan was to have Mr. Bregman return to their home after the home was remodeled to accommodate his needs. Mr. Bregman provided companionship, guidance, counselling and support for Mrs. Bregman. As a result of his death, she has lost her soul mate.

Elsie Miller, 97 years old, is Mr. Bregman's sister. She too visited Mr. Bregman regularly. On January 1, 2011, Ms. Miller arrived at the hospital at approximately 10:30 or 11:00 a.m. When Ms. Miller arrived, Mrs. Bregman was already there. The two spent the day with Mr. Bregman. Mr. Bregman was restless that day. Ms. Miller saw nurses enter the room to provide Mr. Bregman liquid through his feeding tube and change his position. When she left, Mr. Bregman appeared comfortable and relaxed.

Glen Bregman, Mr. Bregman's son, also visited his father while Mr. Bregman lived in the nursing home. Glen Bregman and his brother would take their father to breakfast every Saturday. Other times, the family would go out to dinner. Mr. Bregman would return to the family home for holidays. Mr. Bregman provided counselling and support for his son, Glen Bregman. Glen Bregman has lost the

comfort of his father. Glen Bregman visited his father on January 1, 2011, in the morning, between 9:00 a.m. and 10:00 .a.m. He only stayed a few minutes and did not speak with any of the doctors or nurses.

Keith Bregman, Mr. Bregman's son, visited him frequently. He attended the weekly breakfasts with his father and brother. Keith Bregman would physically pick up Mr. Bregman in his car to take him to the family home. Like Glen Bregman, Keith Bregman lost the counsel and advice of his beloved father.

The VA nursing staff's conduct in charting fell below the standard of care.

## VI. CONCLUSIONS OF LAW[9]

"In bench trials, [Federal Rule of Civil Procedure] 52(a) requires a court to 'find the facts specially and state separately its conclusions of law thereon.'" *Vance v. Am. Haw. Cruises, Inc.*, 789 F.2d 790, 792 (9th Cir. 1986). "One purpose behind Rule 52(a) is to aid the appellate court's understanding of the basis of the trial court's decision. This purpose is achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate conclusions." *Id.* (citations omitted). Furthermore, the court "is not required to base its findings on each and every fact presented at trial." *Id. See generally Kurth v. Hartford Life & Accident Ins. Co.*, 845 F. Supp. 2d 1087, 1091 (C.D. Cal. 2012).

The Federal Tort Claims Act imposes liability upon the United States to the same extent as a private person under like circumstances and according to the law of the place where the conduct complained of occurred. 28 U.S.C. § 1346(b)(1). As a result, California law governs Plaintiff's claims. *Id.*; *id.* § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances"); *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1181 (9th

---

[9] Any conclusion of law which is determined to also be a finding of fact is so deemed.

Cir. 2010) (holding the FTCA waives sovereign immunity where "a private person would be liable to the claimant" but applies "only if state law would impose liability on private persons under similar circumstances").

A wrongful death action may be brought by a decedent's spouse. Cal. Civ. Proc. Code § 377.60(a); *Ruiz v. Podolsky*, 50 Cal. 4th 838, 844 (Cal. 2010). A wrongful death action, although statutory, is not a derivative claim of the act causing death, but rather a separate and independent claim. *Schwarder v. United States*, 974 F.2d 1118, 1123 (9th Cir. 1992); *Aspinall v. McDonnell Douglas Corp.*, 625 F.2d 325, 327 (9th Cir. 1980); *see also Grant v. McAuliffe*, 41 Cal. 2d 859, 864 (Cal. 1953); CACI No. 3921, Damages: Wrongful Death (Death of an Adult) (citing *Barrett v. Superior Court*, 222 Cal. App. 3d 1176, 1184 (Cal. Ct. App. 1990).

"The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of pecuniary loss suffered by the heirs." *Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th 788, 806 (Cal. 2010) (citation omitted).

To prevail on its claim, Plaintiff must establish, by a preponderance of the evidence: (1) Defendants had a duty to use such skill, prudence and diligence as other members of the profession commonly possess and exercise in rendering care and treatment; (2) Defendants breached their duty; (3) there exists a proximate causal connection between the negligent conduct and injury; and (4) the negligent conduct resulted in loss or damage to Plaintiffs. *See Johnson v. Superior Court*, 143 Cal. App. 4th 297, 305 (Cal. Ct. App. 2006); *see also Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009) (citing *McGarry v. Sax*, 158 Cal. App. 983, 994 (Cal. Ct. App. 2008)); CACI No. 400, Negligence—Essential Factual Elements (citing *Ladd v. Cnty. of San Mateo*, 12 Cal. 4th 913, 917 (Cal. 1996).

To prove causation, a plaintiff must establish "(1) that the defendant's breach of duty . . . was a substantial factor in bringing about the plaintiff's harm and (2) that there is no rule of law relieving the defendant of liability." *Mayes v. Bryan*, 139 Cal.

App. 4th 1075, 1093 (Cal. Ct. App. 2006) (internal citations and quotation marks omitted); CACI No. 430, Causation: Substantial Factor; CACI No. 431, Causation: Multiple Causes.

In the context of medical malpractice actions, "causation is proven when a plaintiff produces sufficient evidence to allow the [Court] to infer that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result." *Mayes*, 44 Cal. Rptr. 3d at 25 (citations and quotation marks omitted).

> The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case . . . . There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury.

*Miranda v. Bomel Constr. Co.*, 187 Cal. App. 4th 1326, 1336 (Cal. Ct. App. 2010) (quoting *Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396, 402–03 (Cal. Ct. App. 1985)); CACI No. 431, Causation: Multiple Causes (directing that "[a] person's negligence may combine with another factor to cause harm," even if the other factor is "also a substantial factor"); CACI No. 518, Medical Malpractice: Res ipsa loquitor; CACI No. 500, Medical Negligence—Essential Factual Elements; CACI No. 518, Medical Malpractice: Res ipsa loquitor.

A plaintiff must prove each of these elements by a preponderance of the evidence. *See Johnson*, 143 Cal. App. 4th at 305.

To meet the burden of proof on a claim of medical malpractice, a plaintiff must offer competent expert testimony. *Flowers v. Torrance Mem'l Hosp. Med. Ctr.*, 8 Cal. 4th 992, 1001 (Cal. 2010); *Jameson v. Desta*, 215 Cal. App. 4th 1144, 1171 (Cal. Ct. App. 2013) (requiring experts to establish standard of care); *Jennings v. Palomar Pomerado Health Sys., Inc.*, 114 Cal. App. 4th 1108, 1118 (Cal. Ct. App. 2003) (requiring "competent expert testimony" to establish causation).

Proffered expert testimony must be based upon sufficient facts or data, and the product of reliable principles and methods. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that it is within a district court's discretion to exclude opinion evidence "connected to existing data only by the *ipse dixit* of the expert" where it finds "there is simply too great an analytical gap between the data and the opinion proffered"); *Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (holding that if trial court reasonably concludes that witness's conclusion does not follow from his analysis, it may properly exclude evidence as unreliable).

A treating physician may testify to personal observations as a percipient witness and, like any other expert, provide both fact and opinion testimony. *See Schreiber v. Estate of Kiser*, 22 Cal. 4th 31, 35 (Cal. 1999). Thus, a treating physician "may testify as to any opinions formed on the basis of facts independently acquired and informed by his training, skill, and experience." *Id.* at 726. These opinions may include opinions regarding causation and standard of care because such issues are inherent in a physician's work. *Id.*; *Brown v. Colm*, 11 Cal. 3d 639, 643–44 (Cal. 1974) (noting standard of care "is ordinarily provided by another physician; however, "there is no question that a professional physician may rely upon medical books as the basis for his testimony); *Cnty. of L.A. v. Superior Court*, 224 Cal. App. 3d 1446, 1455 (Cal. Ct. App. 1990) (holding defendant physician may provide expert testimony to establish plaintiff's prima facie case, but party

physician's expert opinions are otherwise irrelevant unless physician is designated an expert witness).

In performing professional services for a patient, a physician has the duty to "exercise that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances." *Barris v. Cnty. of L.A.*, 20 Cal. 4th 101, 108 n.1 (Cal. 1999); *Alef v. Alta Bates Hosp.*, 5 Cal. App. 4th 208, 215 (Cal. Ct. App. 1992); *Jameson*, 215 Cal. App. 4th at 1171.

Untoward consequences that occur as a result of a physician's error in judgment will not render that physician negligent absent a failure to meet the applicable standard of care. *Wilson v. Ritto*, 105 Cal. App. 4th 361, 369 (Cal. 2003) (quoting *Huffman v. Lindquist*, 37 Cal. 2d 465, 475 (Cal. 1951)). "The fact that another physician might have elected to treat the case differently or to use methods other than those employed by defendant does not of itself establish negligence." *Adams v. Boyce*, 37 Cal. App. 2d 541, 549 (Cal. Ct. App. 1940) (noting a doctor is not "required to guarantee results"); *Costa v. Regents of Univ. of Cal.*, 116 Cal. App. 2d 445, 458 (Cal. Ct. App. 1953); *Johnson v. Clarke*, 98 Cal. App. 358, 361 (Cal. Ct. App. 1929) (noting "a doctor is not a warrantor of cures").

A physician is not liable for a result or occurrence that was caused "by the natural course of a disease or condition, or was the natural or expected result of reasonable treatment rendered for the disease or condition." Cal. Civ. Code § 1714.8(a); *Minneci v. Pollard*, 132 S. Ct. 617, 624 (2012) (holding that § 1714.8(a) "basically reflects general principles of tort law present . . . in the law of every State").

Where more than one recognized procedure or approach to a medical problem exists and no single procedure is used by all reputable practitioners, a physician will not be found negligent if, in exercising her best judgment, she selects a particular approved procedure or approach that is determined to be unfavored. California Jury Instructions Civil, BAJI 6.03; *Polikoff v. United States*, 776 F. Supp. 1417, 1421

(S.D. Cal. 1991) ("a physician is not negligent if, in exercising his best judgment, he selects one of the approved methods which later turns out to be the wrong selection or one not favored by certain other practitioners"); *Mathis v. Morrissey*, 11 Cal. App. 4th 332, 342–43 (Cal. Ct. App. 1992) (holding that differing medical opinions should be disclosed to patients, but their existence does not establish that the determination to use one course of treatment over another was negligent); *Munro v. Regents of Univ. of Cal.*, 215 Cal. App. 3d 977, 984 (Cal. Ct. App. 1989) (holding physician has no duty to inform patient of course of treatment or diagnosis that is not generally accepted).

The circumstances to be considered in deciding the negligence of a defendant are "those which the evidence shows may reasonably be supposed to have been known to such person, and to have influenced his mind and actions at the time." *Scott v. San Bernardino Valley Traction Co.*, 152 Cal. 604, 607 (Cal. 1908); *Vandi v. Permanente Med. Grp., Inc.*, 7 Cal. App. 4th 1064, 1070 (Cal. Ct. App. 1992) (same). Negligence in a malpractice action is not to be determined by hindsight nor by what a party subsequently learns. *Scarano v. Schnoor*, 158 Cal. App. 2d 612, 622 (Cal. Ct. App. 1958); *see also Cnty. of L.A. v. Superior Court*, 224 Cal. App. 3d 1446, 1455 (Cal. Ct. App. 1990) (same).

The Court finds that Defendants owed Mr. Bregman a duty to a "reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances."

The Court finds that the care provided by Defendants and its employees did not fall below the standard of care.

The Court finds that the charting of the nurses fell below the standard of care, but did not cause Mr. Bregman's death.

Plaintiff has failed to prove that Defendant or any of its employees committed any medical malpractice with respect to the claims advanced by Plaintiff in this action.

Even assuming that Defendants' actions fell below the requisite standard of care, Plaintiff has failed to prove that Defendants or any of its employees actions caused Mr. Bregman's death.  Mr. Bregman's death was caused the natural course of his weakening condition.  There is no evidence to support the conclusion that Mr. Bregman died of an aspiration event.

## VII.  CONCLUSION

This case is a tragedy for Mrs. Bregman.  She faithfully cared for her husband of 67 years, visiting him daily.  She has lost the love of her life.  Yet, simply put, she has not established and the Court cannot conclude that any of the actions taken by Defendant or its employees caused Mr. Bregman's demise.

Defendant is hereby ordered to file a proposed judgment consistent with the Court's findings by October 14, 2014.  Any pending motions on the docket are now moot.

Judgment is for Defendant.

**IT IS SO ORDERED.**

Dated:  October 2, 2014    _____
HONORABLE BEVERLY REID O'CONNELL
UNITED STATES DISTRICT COURT JUDGE